UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| AVATAR BUSINESS CONNECTION, INC., | HON. JEROME B. SIMANDLE |
| Plaintiff, | Civil Action No. 04-1866 (JBS) |
| v. | |
| UNI-MARTS, INC., | **OPINION** |
| Defendant. | |

APPEARANCES:

Peter M. Rhodes, Esq.
Donald F. Browne, Jr., Esq.
CAHILL, WILINSKI, RHODES & JOYCE
89 Haddon Avenue, Suite A
Haddonfield, New Jersey 080333
    Attorneys for Plaintiff

Adrienne C. Rogove, Esq.
Michael J. Conlan, Esq.
SAUL EWING LLP
750 College Road East, Ste. 100
Princeton, New Jersey 08540
    Attorneys for Defendant

**SIMANDLE**, District Judge:

This matter comes before the Court upon a motion by Defendant Uni-Marts, Inc. for summary judgment against Plaintiff Avatar Business Connection, Inc., and cross-motion by Plaintiff for summary judgment against Defendant.  For the reasons discussed below, this Court finds that no reasonable jury could find that Plaintiff is owed a commission under the Second Brokerage Agreement (as defined below).  Further, the Court finds

that Plaintiff's claims under the doctrine of quantum meruit and for breach of the duty of good faith and fair dealing, raised for the first time in Plaintiff's brief in support of its motion for summary judgment, are not part of the pleadings and will not be considered in these cross-motions; Plaintiff's last-minute motion to amend will be addressed separately. Accordingly, Defendant's summary judgment motion will be granted and Plaintiff's cross-motion for summary judgment will be denied. **I.   BACKGROUND**

Defendant, Uni-Marts, Inc.,("Uni-Marts" or "Defendant") was until June of 2004, a publicly-traded company with its principal place of business in State College, Pennsylvania. (<u>See</u> Complaint ¶ 2.) Defendant is in the business of owning and operating convenience stores and discount tobacco stores. (<u>See</u> Complaint ¶ 6.) Defendant owns 282 stores (including, in many instances, the real estate on which the stores are situated) throughout New Jersey, Pennsylvania, Maryland, Delaware, New York and Virginia. (<u>See</u> <u>id</u>.)

In early 2002, Defendant began experiencing financial difficulties. (Affidavit of Ara Kervandjian ¶4.) In response to the company's financial situation, Defendant's management devised a strategy for the divestiture of 190 of its convenience stores. (<u>Id</u>.) Management presented its plan to Defendant's board of directors who in turn formed an Ad Hoc Committee charged with studying the divestiture plan. (<u>Id</u>.) In furtherance of the

2

board's directive, the Ad Hoc Committee engaged two companies to serve as the Committee's financial advisors, instructing them that, while Defendant's principal goal was to sell the 190 stores identified in the divestiture plan, they should also explore other strategic alternatives to enhance the value of the company for the stockholders (either through the sale of the company's assets or another business combination). (Proxy Statement of Uni-marts, Inc., dated 6/4/2004, p. 17, Kervandjian Aff., Ex. B.) In July of 2002, the financial advisors prepared a confidential memorandum describing the business assets of the 170[1] of the stores for sale and had received two written indications of interest which eventually materialized into definitive purchase offers. (Id.)

### A. Defendant Engages Plaintiff under the Expired Brokerage Agreement to Serve as Defendant's Business Broker.

While pursuing the plan to divest the 170 identified stores, Defendant also engaged Plaintiff, Avatar Business Connections, Inc. ("Avatar" or "Plaintiff") to serve as its business broker charged with marketing the business assets of 67 other Uni-Marts stores. (See Kervandjian Aff. ¶ 6; see also Deposition Testimony of Braja Mahapatra at 33.) Plaintiff, located in Cherry Hill, New Jersey, specializes in brokering transactions involving

---

[1]  The divestiture plan was amended slightly to eliminate 20 stores that the company had originally marked for divestiture. (Id.)

convenience stores and gasoline service stations.  The agreement between Defendants and Plaintiff was memorialized in a September 19, 2002 exclusive brokerage agreement (the "Expired Brokerage Agreement"). (Expired Brokerage Agreement, Kervandjian Aff., Ex. C.)

The Expired Brokerage Agreement contained two provisions that are important to the dispute now before the Court.  First, Defendant agreed to pay Plaintiff an 8% commission in the event that Plaintiff procured a buyer for any of the 67 stores identified in Exhibit A to the agreement (defined in the agreement as the "Assets").  (Id. at § 3.1). Of the 67 stores, Uni-Marts owned the real estate on which the store was located for at least 22 locations. (See Expired Brokerage Agreement, Ex. A.) Second, because Defendant was also exploring the possibility of selling the entire company (either through an asset sale, stock sale or other business combination), the parties negotiated (and the agreement contained) a so-called "wind-up" provision. (See id. §3.3.)  This provision stated that, in the event Defendant sells all of the assets of the company or undergoes another business combination resulting in a change of control of equity ownership during the term of the Expired Brokerage Agreement or any renewal period, Defendant will pay Plaintiff a flat fee of $2,500 for any unsold store listed on Exhibit A.

(<u>Id</u>.)[2] Such payment was to be made in lieu of a commission. (<u>Id</u>.)
The Expired Brokerage Agreement expired by its terms on March 19,
2003. (<u>See</u> <u>id</u>. at §5.1.)

**B.  Defendant and Plaintiff Enter into a Second Brokerage
     Agreement.**

On March 26, 2003, Uni-Marts and Avatar entered into a
second brokerage agreement (the "Second Brokerage Agreement").
(<u>See</u> Second Brokerage Agreement, Kervandjian Aff. ¶ 11 and Ex.
D.) The Second Brokerage Agreement, which also had a six month-
term, expressly replaced and superseded the Expired Brokerage
Agreement.[3] (<u>See</u> Kervandjian Aff. ¶ 13.) In addition, the Second

---

[2] Specifically, Section 3.3. of the Expired Brokerage
Agreement provided, in pertinent part:

> Uni-Marts, Inc. agrees to pay Broker a fee equal to two-
> thousand five-hundred dollars ($2,500) per remaining location
> listed on Exhibit A in lieu of the Broker Fee described in
> Article 3.1 (the "Windup Fee"), if during the original or any
> subsequent renewal period of this Agreement, Uni-Marts, Inc.
> entered into a sales agreement with a third party that may
> include, as part of a larger transaction, (1) the sale of all
> or the remaining Assets listed in Exhibit A, or (2) a
> transaction that causes a change of control of Uni-Mart's
> current equity ownership structure.

[3] The "Background" Section of the Second Brokerage
Agreement provided, in pertinent part:

> Uni-Marts, Inc. had previously entered into a Brokerage
> Agreement dated September 19, 2002 with Broker, a copy of
> which is attached and made part of this Agreement, which
> expired on March 19, 2003 (the "Expired Brokerage Agreement").
> **This Agreement supersedes all of the terms and conditions of
> the Expired Brokerage Agreement, except for Article 2.2
> [relating to confidentiality], and both parties release the
> other from any and all claims that may be asserted against the**

Brokerage Agreement contained a merger clause stating that the agreement "contains the entire agreement and understanding between the parties with respect to the subject matter identified and referenced in this Agreement." (Second Brokerage Agreement, §6.5.)  As in the Expired Brokerage Agreement, Plaintiff (1) was entitled to a commission if an "Asset" (as defined in the Second Brokerage Agreement) was purchased by a party procured by Plaintiff[4] and (2) would be paid its commission only at the closing of the sale of the Asset(s) and solely from the proceeds Defendant realized from such sale.[5]

---

**other under the Expired Brokerage Agreement** as of the date hereof. (emphasis added)

[4]  Specifically, Section 3.1 of the Second Brokerage Agreement stated that:

> Broker shall receive, as full compensation for its services hereunder, an amount equal to six percent (6%) of the total gross sale price of Assets purchased by parties identified by Broker (the "Broker Fee"). Gross sale price does not include amounts paid by identified parties under any transaction for ongoing lease commitments, business arrangements and both underground petroleum and in-store merchandise inventories (the "Excluded Assets.")

[5]  Section 3.5 of the Second Brokerage Agreement states, in pertinent part:

> The compensation due hereunder shall be deemed to have been earned on the date **on which a closing of the sale of Assets occurs** and **only with respect to all monies actually received** by Uni-Marts. (emphasis added)

6

The Second Brokerage Agreement contains four major differences from the Expired Brokerage Agreement relevant to the dispute presently before the Court. They are as follows:

1. The Second Agreement was non-exclusive. (See Second Brokerage Agreement §1.1.)

2. The number of store locations contained in the definition of "Assets" and included on the exhibit attached to the agreement was increased from 67 to 155 stores in the Second Brokerage Agreement. (See Second Brokerage Agreement, Ex. A.) Of the 155 store locations, Uni-Marts owned the real estate on which 99 stores were located and leased the premises for the other 56 locations. (See id.)

3. Instead of receiving an 8% commission on the total gross sale price of the Assets, the parties agreed that Avatar would receive "6% of the total gross sale price of Assets purchased by parties identified by Broker." (Second Brokerage Agreement § 3.1; see Kervandjian Aff. ¶ 18.)

4. The Second Brokerage Agreement did not contain a "windup" provision. (See Second Brokerage Agreement; see also Kervandjian Aff. ¶ 17.)

One major issue discussed by the parties in their briefs and at oral argument is the relevance, if any, of the absence of the provision regarding the "windup fee." According to the declaration of Defendant's former President, Ara Kervandjian, the "windup" provision was eliminated because Defendant was actively pursuing a stock sale and wished to avoid any obligation to pay a "windup fee" in the event of a change in control of the equity interest in Defendant. (Kervandjian Aff. ¶ 17.) Representatives from Plaintiff never inquired about the absence of this provision in the Second Agreement. (Mahapatra Depo. Tr. at 18.) Defendant

7

also used the fact that the Ad Hoc Committee was actively "shopping" the company (as well as shopping individual stores) and pressure from the company's bondholders as the justification for making the Second Brokerage Agreement non-exclusive. (Kervandjian Aff. ¶ 17.)

During the term of the Second Brokerage Agreement, Plaintiff sold a total of eight of the Assets covered in Exhibit A of the Second Brokerage Agreement. (Kervandjian Aff. ¶ 16.)

**C.   Defendant Attempts, Independent of Plaintiff, to Sell the Company.**

Beginning in the summer of 2002 and continuing through early 2004, Defendant's Ad Hoc Committee actively investigated many alternatives to divest certain assets or sell the company outside of the efforts being made by Plaintiff. (Proxy Statement, p. 17.) Specifically, according to Defendant's Proxy Statement, the Ad Hoc Committee, through its newly-hired investment bankers, was aggressively pursuing the sale of individual store locations, auctions for individual store locations, a possible stock acquisition of the company and a "going-private" merger transaction. (Id. at 17-30.) Between 2002 and 2004, Defendant had a number of ultimately unsuccessful suitors interested in acquiring either substantial assets of its business or its entire business. (Id.)  For example:

1. In May, 2003, Defendant signed letters of intent with an entity named United Refining (for a cash merger) and HFL Corporation (for a purchase of all of Defendant's stock).

(Id. at 18-20.) Defendant had  negotiations with both companies, but neither lead to a definitive purchase offer. (Id.)

2. In the Spring of 2003, Defendant and representatives of the Ordoukhanian family (owners of 11.7% of Defendant's outstanding common stock) discussed the family acquiring all of the stock of Defendant. (Id. at 26.) No agreement was reached. (Id.)

3. In June of 2003, Defendant entered negotiations with an individual named Raj Vakharia for the purchase of 125 Uni-Marts stores.[6] (Mahapatra Depo. Tr. 121, 127.) Negotiations took place and Vakharia submitted a draft asset purchase agreement to Defendant. (Id. at 23.) Defendant eventually terminated negotiations with Vakharia in July of 2003, however, after it became clear that the parties could not reach an agreement as to the structure and timing of the deal. (Id.)

4. In August of 2003, Defendant began talks with an entity called Reliance Management, LLC ("Reliance") regarding the possible acquisition of all of the stock of Defendant. (Proxy Statement, p. 24.) Raj Vakharia and a business associate, Paul Levinsohn, were the principals of Reliance. (Id.) The parties entered into an exclusivity agreement and conducted due diligence. (Id.) The term of the exclusivity was extended several times, but negotiations were eventually terminated due to disagreement over environmental issues and representation and warranty insurance. (Id.)

5. In December of 2003, the Ad Hoc Committee reviewed a financial analysis prepared by the National Real Estate Clearing House, a company specializing in the accelerated divestiture of petroleum and convenience store properties through an auction process. (Id. at 18.) After consideration of the analysis by the committee, the idea of an auction process was dismissed. (Id.)

---

[6]  The parties do not dispute that Plaintiff introduced Mr. Vakharia to Defendant as Defendant's counsel conceded at oral argument. (See also Mahapatra Depo. Tr. at 21.) However, the parties do dispute whether Plaintiff also introduced Mr. Vakharia's business associate (and, eventually, the other principal in KOTA Holdings, LLC) Paul Levinsohn to Defendant. See Letter from Adrienne Rogove, dated 10/28/05.  This issue is discussed more fully in note 8, infra.

In December of 2003, Mr. Vakharia again approached Defendant's management about a potential deal to take Defendant private through a merger. (Id.) Specifically, a group of buyers proposed establishing a limited liability company called Green Valley Acquisition Co., LLC. ("Green Valley") that would serve as an acquisition company. (Id. at 28.) Green Valley in turn would be owned by two limited liability companies: Tri-Color Holdings, LLC ("Tri-Color")(whose members were three individuals that were directors and executive officers of Defendant) and KOTA Holdings, LLC ("KOTA")(whose members were Raj Vakharia and Paul Levinsohn). After the establishment of Green Valley, Uni-Marts would merge with Green Valley with Green Valley emerging as the surviving company. (Id.)

The parties signed a merger agreement on January 26, 2004 after the Defendant board of directors approved the transaction as detailed above. (Kervandjian Aff. ¶ 20.) On June 30, 2004 the merger became effective.[7] (Kervandjian Aff., Ex. J.) Upon consummation of the merger, Tri-Color contributed approximately $10,000,000 to Green Valley (in the form of $3,000,000 cash and $7,000,000 representing the value of the rights that Tri-Color's

---

[7] Specifically, the merger became effective upon the filing of a certificate of merger with the Commonwealth of Pennsylvania (Green Valley was a Pennsylvania LLC) and the State of Delaware (as Uni-Marts is a Delaware corporation). (See Proxy Statement.)

members had to receive merger consideration as shareholders of
Uni-Marts, Inc.) (Kervandjian Aff. ¶ 26.) KOTA's contribution to
Green Valley amounted to approximately $6,800,000 (of which
$2,000,000 was contributed by KOTA's management (Vakharia and
Levinsohn) and $4,800,000 was contributed by KOTA's unaffiliated
preferred equity investors). (Id.) The cash consideration was
paid into a trust which was the vehicle by which Defendant's
public shareholders were paid out. (See Proxy Statement) Each
issued and outstanding share of Defendant's common stock was
cancelled and converted automatically into a right to receive a
cash pay-out to shareholders of $2.25 per share. (See id.) In
addition, immediately upon consummation of the merger, Green
Valley changed its name to Uni-Marts, LLC. (Kervandjian Aff., Ex.
K.)

### D.   Procedural History

On April 15, 2004, Plaintiff filed suit with this court
alleging that Defendant breached the "broker agreements" and
Plaintiff is owed a commission. (Compl. ¶ 12.) Plaintiff does not
state which broker agreement (the Expired Brokers Agreement or
the Second Agreement) the commission is owed under nor did
Plaintiff state its demanded damages. (See id.) Defendant filed
its Answer on July 6, 2004.  After a Rule 16 Conference and
conclusion of discovery, Defendants filed the present motion for
summary judgment. On August 22, 2005, Plaintiff filed its cross-

motion and opposition to Defendant's motion.  Defendant filed its opposition to Plaintiff's cross-motion on September 20, 2005. This Court heard oral argument on the cross-motions for summary judgment on October 14, 2005.

The Court notes that, the night before oral argument (on October 13, 2005 at 8:05 p.m.), Plaintiff filed a Motion to Amend/Correct its Complaint.  Plaintiff seeks to (a) add Uni-Marts, LLC as a defendant and (b) add causes of action for fraud, quantum meruit/unjust enrichment.  See Plaintiff's Certification, dated October 13, 2005.  Local Civil Rule 7.1(f)(2) requires that a Plaintiff attach a proposed amended complaint to its motion to file an amended complaint.  Although Plaintiff's Certification in Support of Plaintiff's Motion to File an Amended Complaint states that a proposed Amended Complaint is attached to Exhibit A to the Certification, none was attached (although Plaintiff did provide a proposed amended complaint on October 17, 2005.) As such, for the purposes of the cross-motions for summary judgment, this motion to file an amended complaint was not considered.[8]

---

[8]  This Opinion does not address Plaintiff's eleventh-hour motion to file an Amended Complaint.  Although it may be unorthodox or even clumsy to present a motion to amend at this late stage, precedent makes clear that such a motion must be considered, and its timeliness is only one factor among many that the court is to consider under Rule 15(a), Fed. R. Civ. P.  The Court of Appeals has determined that it would be an abuse of discretion to refuse to entertain a motion to amend even after summary judgment is entered.  Adams v. Gould, Inc., 739 F.2d 858, 869 (3d Cir. 1984), cert. denied, 469 U.S. 1122 (1985); see also Newark Branch, NAACP v. Town of Harrison, 907 F.3d 1408, 1417(3d

## II.  <u>SUMMARY JUDGMENT STANDARD OF REVIEW</u>

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. <u>Id</u>.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  <u>Id</u>.

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "[T]he nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999) (quoting <u>Liberty Lobby</u>, 477 U.S. at 255).  The threshold

---

Cir. 1990.) This is especially true where no explicit deadline for filing motions to amend was set in the Scheduling Orders under Rule 16(b)(1), Fed. R. Civ. P., and the Final Pretrial Order has not yet been entered (an amendment to pleadings after the Rule 16(b)(1) deadline expires requires a showing of "good cause," <u>see</u> Rule 16(b).) After entry of the Final Pretrial Order, an amendment would be permitted "only to prevent manifest injustice," <u>see</u> Rule 16(e), Fed. R. Civ. P. In any event, Plaintiff's motion to amend to add new claims for <u>in</u> <u>quantum</u> <u>meruit</u>, fraud and for breach of covenant of good faith and fair dealing will be considered separately in the very near future.

inquiry is whether there are "any genuine factual issues that
properly can be resolved only by a finder of fact because they
may reasonably be resolved in favor of either party." <u>Liberty
Lobby</u>, 477 U.S. at 250; <u>Brewer v. Quaker State Oil Refining
Corp.</u>, 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

The moving party always bears the initial burden of showing
that no genuine issue of material fact exists, regardless of
which party ultimately would have the burden of persuasion at
trial.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).
However, where the nonmoving party bears the burden of persuasion
at trial, as plaintiff does in the present case, "the burden on
the moving party may be discharged by 'showing' -- that is,
pointing out to the district court -- that there is an absence of
evidence to support the nonmoving party's case." <u>Celotex Corp.</u>,
477 U.S. at 325.

The non-moving party "may not rest upon the mere allegations
or denials of" its pleading in order to show the existence of a
genuine issue.  Fed. R. Civ. P. 56(e).  Plaintiff must do more
than rely only "upon bare assertions, conclusory allegations or
suspicions." <u>Gans v. Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985),
<u>cert</u>. <u>denied</u>, 474 U.S. 1010 (1985) (citation omitted); <u>see
Liberty Lobby</u>, 477 U.S. at 249-50.  Thus, if the plaintiff's
evidence is a mere scintilla or is "not significantly probative,"
the court may grant summary judgment.  <u>Liberty Lobby</u>, 477 U.S. at

249-50; Country Floors, 930 F.2d at 1061-62.

The summary judgment standard does not change when the parties have filed cross-motions for summary judgment.  See Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987).  Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (citing Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).  If review of cross-motions for summary judgment reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts.  See Iberia Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998) (citing Ciarlante v. Brown & Williamson Tobacco Corp., 143 F.3d 139, 145-46 (3d Cir. 1988)).

## III.  **DISCUSSION**

In its Complaint, Plaintiff claims that Defendant breached both the Expired Brokerage Agreement and the Second Brokerage Agreement and that Plaintiff is entitled to damages.  (See Compl. ¶ 12.)  In addressing Plaintiff's claim and the parties' cross-motions for summary judgment, this Court concludes first that the

15

Second Brokerage Agreement (and not the Expired Brokerage Agreement) controls the current dispute and governs the rights and obligations of the parties (see Section A, infra).  Second, this Court holds that Defendant is not obligated to pay Plaintiff a commission under the Second Brokerage Agreement because Green Valley Acquisitions, LLC - not the party that Plaintiff introduced to Defendant (Raj Vakharia) - was the "buyer" of Uni-Marts, Inc (see Section B, infra).  Third, even if Vakharia was considered the "buyer" of Uni-Marts, the acquisition of the business of Uni-Marts, Inc. was not a "sale of assets" but a merger.  According to a strict interpretation of the Second Brokerage Agreement, only a sale of "assets" triggers Defendant's obligation to pay a commission (see Section C, infra.) Finally, this Court rejects Plaintiff's other claims (i.e., breach of the covenant of good faith and fair dealing and quantum meruit) as untimely and without merit (see Section D, infra).  Thus, this Court finds that, viewing the facts in light most favorable to Plaintiff, no reasonable jury could find that Plaintiff is owed a commission either under the terms of the Second Brokerage Agreement or Plaintiff's new claims.

**A.   The Second Brokerage Agreement (and not the Expired Brokerage Agreement) Governs the Rights and Obligations of the Parties.**

Plaintiff's Complaint alleges that Defendant owes Plaintiff a commission because Defendant breached both the Expired

16

Brokerage Agreement and the Second Brokerage Agreement.  (See Compl. § 12.)  Defendant argues that the question of whether Plaintiff is entitled to a commission is governed by the Second Brokerage Agreement because (1) the Expired Brokerage Agreement is expired on its terms and (2) the Second Brokerage Agreement clearly and unequivocally supersedes the Expired Brokerage Agreement. (See Def.'s Br. at 13.)

Under New Jersey law, when a subsequent contract exists which (i) on its face purports to contain the entire agreement and (ii) clearly supersedes any prior agreement, then "in the absence of ambiguity, the rights, duties and obligations of the parties are to be determined" from the subsequent contract. Montclair Distrib. Co., Inc. v. Arnold Bakers, Inc., 1 N.J. Super. 568, 573 (Ch. Div. 1948).  Here, it is clear from the Second Brokerage Agreement that the Second Brokerage Agreement purports to (a) substitute and replace the Expired Brokerage Agreement and (b) constitute the entire agreement between the parties. (See Second Brokerage Agreement "Background Section" and §6.5.) In particular, the preamble to the Second Brokerage Agreement states:

> This Agreement **supersedes all of the terms and conditions of the Expired Brokerage Agreement.**..and both parties release the other from any and all claims that may be asserted against the other under the Expired Brokerage Agreement....

(emphasis added).  The Second Brokerage Agreement likewise

identified with specificity the only portion of the Expired Brokerage Agreement which survived, namely, Article 2.2 relating to confidentiality.  Finally, Section 6.5 of the Second Brokerage Agreement expressly states that this agreement "contains the entire agreement and understanding between the parties with respect to the subject matter identified and referenced in this Agreement." (Second Brokerage Agreement § 6.5.)  Moreover, Plaintiff did not dispute, either in its moving papers and at oral argument, that the Second Brokerage Agreement controls the rights and obligations of the parties. (Pl.'s Br. at 15.) Accordingly, this Court will look to the Second Brokerage Agreement as governing the relationship between the parties.

### B.   Under the Second Brokerage Agreement, Plaintiff is not Entitled to a Commission because Vakharia was not the "Buyer" of Uni-Marts, Inc.

In its motion for summary judgment, Defendant argues that under the terms of the Second Brokerage Agreement, it is not obligated to pay a commission to Plaintiff because Plaintiff did not procure for Defendant the "buyer" of Uni-Marts, Inc. According to Defendant, under the Second Brokerage Agreement a commission is payable only if Plaintiff procures or identifies a "buyer" for Defendant's assets.  Because Plaintiff did not introduce Defendant to Green Valley Acquisitions, LLC (only to Raj Vakharia, a second-tier investor) under a strict construction of the Second Brokerage Agreement, Defendant contends that

18

Plaintiff is not entitled to a commission.

>    **1.   Under New Jersey Law, Contracts Involving the Sale
>          of Real Estate Must be Strictly Construed.**

In deciding the present cross-motions for summary judgment, this Court must first interpret the terms of the Second Brokerage Agreement. "The interpretation or construction of a contract is usually a legal question for the court, 'suitable for a decision on a motion for summary judgment.'" Driscoll Constr. Co. v. State Dep't of Transp., 371 N.J. Super. 304, 313 (App. Div. 2004) quoting Newport Assocs. Dev. Co. v. Travelers Indem. Co. of Illinois, 162 F.3d 789, 792 (3d Cir. 1998).  In these instances, the court's "primary objective in interpreting a contract is to derive the objective intent of the parties at the time of the making of the contract."  In re Combustion Eng'g, Inc., 366 F. Supp.2d 224, 229 (D.N.J. 2005); see also Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1009 (3d Cir. 1980)(in interpreting a contract, a court's paramount consideration is the intent of the parties.)

Under New Jersey law, contracts for brokerage commissions are strictly construed, particularly where they involve the sale of real estate.  Feist & Feist Realty Corp. v. Hansford Prop., Inc., 724 F.2d 31, 33 (3d Cir. 1983). In addition, the burden of proof is on a broker to prove that he or she is entitled to a commission under a broker's agreement.  See Louis Schlesinger Co., v. Kresge Found., 312 F. Supp. 1011, 1016 (D.N.J. 1970).

This Court is bound by the decision in <u>Feist & Feist Realty Corp.</u> and <u>Louis Schlesinger Co.</u> in interpreting the Second Brokerage Agreement because, of the 155 store locations that Plaintiff was engaged to market under the Second Brokerage Agreement, Defendant was selling both the business operations and the real estate of 99 of such locations.

**2.    Under the Strict Construction Standard, No Commission is Payable because Vakharia was not the "Buyer" of Uni-Marts, Inc.**

Defendant does not dispute that Plaintiff introduced Raj Vakharia to Defendant in June of 2003.  (<u>See</u> Mahapatra Depo. Tr. at 127.)  Rather, Defendant argues that because Green Valley Acquisitions, LLC - and not Vakharia - eventually merged with Uni-Marts, Inc., under a strict interpretation of the Second Brokerage Agreement, no commission is owed.  The Second Brokerage Agreement contains specific language regarding when Defendant would be required to pay Plaintiff a commission.  Most prominently, Section 3.1 of the Second Brokerage Agreement states, in pertinent part:

> Broker shall receive...an amount equal to six percent (6%) of the total gross sale price of Assets purchased **by parties identified** by Broker.

(Second Brokerage Agreement § 3.1.)(emphasis added)  Moreover, Section 1.1 of the Second Brokerage Agreement states that Plaintiff is **"engaged to locate a buyer** of the Assets."** (Second Brokerage Agreement § 3.1.)(emphasis added).  Under a strict

interpretation of the agreement, Plaintiff is not owed a commission because it did not procure Green Valley.

Plaintiff analogizes the present case to the case of _Feist & Feist Realty Corp. v. Hansford Prop., Inc._, in which the Third Circuit Court of Appeals reversed a lower court's ruling that a broker was entitled to a broker's fee when certain real estate was purchased, not by the company the broker listed on a brokerage agreement, but by a trust established by the company's chairman. _Feist & Feist Realty Corp._, 724 F.2d at 33. Feist & Feist were licensed real estate brokers who entered into an exclusive brokerage agreement with Hansford Properties to lease and sell a certain property. _See id._ at 32. The brokerage agreement stated that if the premises was sold to "a tenant procured by Feist & Feist," Feist & Feist would be entitled to a commission on the sales price. _Id_. Feist procured Jay Cee Laboratories as a tenant for the property and Jay Cee later notified Hansford that they wished to purchase the premises if they could secure financing. _Id_. at 32-33. After it became apparent that Jay Cee could not obtain the necessary financing, the chairman of Jay Cee's board, operating through a trust he had established for his children, purchased the premises. _Id_. at 33. When Feist & Feist notified Hansford that they were due a commission, Hansford refused to pay, prompting Feist & Feist to sue Hansford for payment of the commission. _Id_.

The Third Circuit Court of Appeals held that (1) as a contract involving real estate, the brokerage contract between the parties had to be strictly construed, and (2) under the clear language of the brokerage contract, Feist & Feist was not entitled to a commission. See id. at 34. Feist & Feist was only entitled to a commission on a sale to a tenant, not a party affiliated with the tenant. See id. ("[H]ere the agreement is specific, and the purchaser does not fall within it.") Absent fraud or conspiracy, the courts will not disregard the difference between a corporate entity (i.e., Jay Cee Laboratories) and an individual (i.e., Jay Cee's chairman of the board of directors or his trust). See id.; see also Ackerman v. Citron, 55 N.J. Super. 122 (Super. Ct. 1959). Another relevant factor was that the ultimate buyer, a trust established by the chairman of Jay Cee's board, was also not the "alter ego" of Jay Cee nor acting on its behalf. See id.

Defendant argues that the holding in Feist & Feist Realty Corp. compels dismissal of Plaintiff's claim. (Def.'s Br. at 18-19). This Court finds Defendant's analogy quite persuasive. Neither Plaintiff's papers submitted in support of its motion/opposition to Defendant's motion nor its efforts at oral argument addressed Defendant's contention that the holding of Feist & Feist Realty Corp. warrants summary judgment in favor of Defendant. The language of the Second Brokerage Agreement

22

expressly states that Plaintiff is owed a commission if it identifies the "purchaser" or "buyer" of certain Assets (as defined in the agreement).

Plaintiff argues that Vakharia is "a principal of Green Valley," "one of the largest equity holders in the new Uni-Mart," and that he was the "mastermind behind the deal." (Pl.'s Opp. Br. at 21-22.) Plaintiff is incorrect, however, in its assertion that Vakharia is either a principal or equity holder of Green Valley. To the contrary, Vakharia owns no part and is not a member of Uni-Marts, LLC (rather he is a member of KATO Holdings, LLC, which has a partial stake in Green Valley (See Proxy Statement). Plaintiff also presents no evidence to substantiate the claim that Vakharia was the "mastermind" behind the transaction other than reports in miscellaneous media advertisements and articles, which are not evidence. Thus, this Court finds Plaintiff's arguments unpersuasive.

The Court finds, based on the uncontradicted evidence, that Raj Vakharia did not buy the assets or the stock of Defendant. Rather, he was merely one of a number of investors that participated in the acquisition of the company. Specifically, Vakharia was only one of two members of a limited liability company (KOTA Holdings, LLC) that in turn was one of two members

of Green Valley - the entity that merged with Uni-Marts, Inc.[9]
KOTA Holdings, LLC combined with Tri-Color Holdings, LLC (which
contributed approximately $10,000,000 in cash and the right to
receive cash to Green Vally) to merge with Uni-Marts, Inc.  Even
among Vakharia's investment company (KOTA Holdings, LLC), he
appears to be just one of a number of investors - as he and
Levinsohn contributed $2,000,000 with other unaffiliated equity
investors contributing $4,800,000 to Green Valley.  (See Proxy
Statement.) Thus, this Court finds that Vakharia was not a
"buyer" or "purchaser" identified or procured by Plaintiff.
Rather, Uni-Marts, Inc. merged into Green Valley, an investment
company in which Vakharia had no direct ownership interest.  As
such, Defendant was not obligated to pay Plaintiff a commission.

The Court should address one additional issue that disfavors
Plaintiff's argument that the language of the Second Brokerage
Agreement "is broad enough to encompass a merger or an asset
sale[]."  (Statements of Peter Rhodes, Esq., counsel for

---

[9]  There has been some confusion about whether Paul
Levinsohn, the other member of KATO Holdings, LLC was also
introduced by Plaintiff to Defendant.  At oral argument, counsel
for Plaintiff stated that Plaintiff introduced Levinsohn as well
as Vakharia to Defendant.  After the argument, in a letter dated
October 28, 2005, Defendant's counsel submitted a letter from
Plaintiff to Defendant listing individuals and entities that
Plaintiff had "brought forth" to Defendants.  (Letter from Braja
Mahapara to Ara Kervandjian, dated September 30, 2003.)  The
letter, dated September 30, 2003, was written after the
expiration of the Second Brokerage Agreement. (Id.) Paul
Levinsohn is not listed on the list. (Id.) Thus, there is no
evidence that Plaintiff introduced Levinsohn.

Plaintiff, Transcript of Oral Argument, dated 10/14/05, p. 24.)
As noted by the Third Circuit in Feist & Feist Realty Corp., a
"brokerage contract can, of course, be so drawn as to give the
broker broader authority" than the contracts the Feist court
addressed.  724 F.2d at 34; see also Ackerman, 55 N.J. Super. at
124.  There is no question that the Second Brokerage Agreement
could have been drafted so that the term "buyer" included not
only the party that Plaintiff introduces to Defendant, but also
the party's affiliates and partners, an investment company the
party establishes, or anyone acting on behalf of that party.
This is especially true (i) in a contract between two
sophisticated parties such as Plaintiff and Defendant and (ii) in
situations where a party would traditionally form an investment
company prior to an acquisition in order to provide personal
liability protection for the individuals participating in the
acquisition.  However, such language was not included in the
Second Brokerage Agreement and this Court declines to rewrite the
Second Brokerage Agreement in this way.

### 3. Plaintiff has Not Made any Allegations of Fraud or Conspiracy or that Vakharia is Green Valley's Alter Ego.

The analysis of this Court would certainly have been
different if, as addressed by the Court in Feist & Feist Realty
Corp., Plaintiff had alleged that Defendant and Vakharia had
conspired to establish certain investment vehicles in an attempt

25

to defraud Plaintiff of its commission.  See Feist & Feist Realty
Corp. 724 F.2d at 33 citing Ackerman, 55 N.J. Super. at 128.
However, (i) in its original Complaint, Plaintiff failed to make
any allegations of fraud or conspiracy[10] and (ii) Plaintiff's
counsel conceded at oral argument that Vakharia's creation of an
investment company used in the merger transaction was not
"created necessarily for the purposes of defrauding anyone."
(Transcript of Oral Argument, 10/14/05, p. 25).  Moreover, there
is no evidence on the record of such a fraud or conspiracy
regarding Plaintiff's commission.

    Similarly, the Court's analysis may have been different had
Plaintiff alleged that Green Valley acted either on Vakharia's
behalf or as his "alter ego."  See Feist & Feist Realty Corp. 724
F.2d at 34.  The Third Circuit Court of Appeals, finding no New
Jersey court that explicitly adopted the "alter ego" theory for
corporations, "fashion[ed] a Federal rule" and applied the rule
in order to determine if a corporate entity is the alter ego of
another person or entity.  See U.S. v. Pisani, 646 F.2d 83, 88
(3d Cir. 1981) citing DeWitt Truck Brokers v. W. Ray Flemming

---

    [10]  As discussed in Section I.D, supra, the Court notes
that, the night before oral argument (on October 13, 2005),
Plaintiff filed a Motion to Amend/Correct its Complaint.
Plaintiff seeks to add a cause of action for fraud, among other
things.  See Plaintiff's Certification, dated October 13, 2005.
For the purposes of the cross-motions for summary judgment, this
motion to file an amended complaint was not considered.

Fruit Co., 540 F.2d 681, 686-87 (4th Cir. 1976).  According to
the Pisani court, some of the relevant factors for determining if
a corporate entity is the alter ego of an individual or another
entity is whether the corporation has non-functioning corporate
officers or directors, the corporation fails to observe corporate
formalities or, whether "the corporation is merely a facade for
the operations of the dominant shareholder or shareholders."[11]
Id.  This Court notes that Plaintiff has presented no facts to
suggest that Vakharia used either Green Valley (or, for that
matter, KOTA Holdings) "merely as a facade" for his operations.[12]
Rather, Vakharia was only one of a number of equity investors who
pooled their interest in Green Valley.  Vakharia neither had a
controlling interest of Green Valley nor did he contribute the
majority of the cash needed as consideration for the merger with
Uni-Marts, Inc.

   **C.  A Sale of Assets was Required to Trigger Defendant's
       Obligation to Pay a Commission under the Second
       Brokerage Agreement and Such a Sale of Assets did not
       Occur.**

     Defendant next argues that, even if Vakharia constitutes a

---

[11]  Other factors articulated by the Pisani court that are
not particularly relevant to the present inquiry are whether the
corporation is grossly undercapitalized for its purposes, the
corporation fails to pay dividends, the absence of corporate
records, and the corporate funds are siphoned off by dominant
shareholders.  Pisani, 646 F.2d at 88.

[12]  Indeed, Plaintiff has presented no evidence suggesting
that Green Valley had non-functioning corporate officers or
failed to observe corporate formalities, either.

"buyer" under the Second Brokerage Agreement, Defendant is still not obligated to pay a commission because the transaction was structured as a merger - not as a sale of "assets" - and a sale of assets is required to trigger Defendant's payment obligation. (Def's Br. at 17.)   Plaintiff argues that such a conclusion would (i) be counter to the parties' intent that Plaintiff be paid a commission regardless of the eventual form of the transaction and (ii) promote "form over substance" resulting in defrauding Plaintiff from the commission he earned. (Pl.'s Br. at 18.)

Again this Court's decision rests on the Court's interpretation of the terms of the Second Brokerage Agreement. See <u>Driscoll Constr. Co.</u>, 371 N.J. Super. at 313.  The Court's "primary objective" in interpreting the Second Brokerage Agreement must be to "derive the objective intent of the parties at the time of the making of the contract."  <u>In re Combustion Eng'g, Inc.</u>, 366 F. Supp.2d at 229. Where, as in this case,[13] a contract is free from ambiguity, evidence of the situation of the parties and the surrounding circumstances and conditions is admissible in order to aid in interpreting the contract. <u>See</u> <u>Driscoll Constr. Co.</u>, 371 N.J. Super. at 313.  As discussed above, under New Jersey law, contracts for brokerage commissions

_____

[13]   The parties do not dispute that the Second Brokerage Agreement is clear and unambiguous.  (<u>See</u> Pl.'s Br. at 14("The Second Brokerage Agreement is an unambiguous writing."); <u>see</u> <u>also</u> Def.'s Br. at 14 ("The Second [Brokerage] Agreement here at issue is clear on its face and fee of ambiguity.")

must be strictly construed, particularly when the contracts
involve the sale of real estate. See Feist & Feist Realty Corp.,
724 F.2d at 33; see also Feist & Feist v. Bloomfield Bank & Trust
Co., 19 A.2d 688 (N.J. 1941).  The Statute of Frauds, which
governs all contracts related to real property, requires that
these agreements be construed strictly.  See id.

> **1.  Under a Strict Construction Standard, Plaintiff is
> not Entitled to a Commission Because the
> Transaction was a Merger not a Sale of Assets.**

Strict construction of the terms of the Second Brokerage
Agreement, according to Defendant, warrants a finding that
Plaintiff is not entitled to a commission.  This is because
Plaintiff's commission is only triggered if (a) Plaintiff
procures a purchaser and (b) the eventual sale is a sale of an
"Asset."  (Def.'s Br. at 18.) This Court agrees.  It is
undisputed that the ultimate transaction between Green Valley and
Uni-Marts, Inc. was a merger.  (See Plan of Merger between Uni-
Marts, Inc. and Green Valley Acquisition Co., LLC, Kervandjian
Aff., Ex. H.) The issue is whether the terms of the Second
Brokerage Agreement are sufficiently broad to cover both a sale
of assets and a merger.

> **a.  The Plain Language of the Second Brokerage
> Agreement**

The term "Asset" is a defined term in the Second Brokerage
Agreement.  The Assets covered by the Second Brokerage Agreement
are specifically identified in an exhibit to the agreement which

lists the address of the business being sold, whether the store is leased or owned by Defendant, whether it includes gas station services (and the type of gas offered), the revenue information about the business, and the asking price and an anticipated contract price. (Id. at 18-19; see Second Brokerage Agreement, Exhibit A.) The term "sale of Assets" or "Assets" appears 16 times in the Second Brokerage Agreement, while there is no mention of the term "stock" or "merger" in the agreement (let alone any discussion of a commission being payable upon the sale of Defendant's stock or a change in control of the equity ownership of Uni-Marts). A strict interpretation of the Second Brokerage Agreement requires this Court to conclude that, because the ultimate transaction Defendant entered into was a merger of the company into another company and not the sale of one or more Assets, Defendant is not obligated to pay the commission.

The Court is unpersuaded by Plaintiff's arguments to the contrary. First, Plaintiff asserts that, although the language of the contract states that Plaintiff will be paid a commission in the event of a "sale of Assets," the parties clearly intended that a commission would be payable if Plaintiff procured a buyer regardless of the ultimate structure of the transaction. (Pl.'s Br. at 20.) This Court, however, cannot insert terms into a contract that are conspicuously absent. Under New Jersey law, a court's obligation is to "enforce the contracts as written."

30

<u>Telcom Int'l America, Ltd. v. AT&T Corp.</u>, 280 F.3d 175, 181 (2d Cir. 2001).  A court must not admit parol evidence of the parties' intent if doing so would result in the "insert[ion of] contractual terms that are...conspicuously absent from the written agreement." <u>Id</u>. at 184 ("New Jersey's parol evidence rule bars consideration of [such] evidence.") Plaintiff's arguments and evidence that the parties intended to create a payment obligation in the event of a stock sale or change of control in addition to a sale of assets constitutes inadmissible parol evidence because such evidence cannot be used to show "an intention wholly unexpressed" in the written agreement.  <u>New York Sash & Door Co. v. National House & Farms Ass'n.</u>, 131 N.J.L. 466, 470 (E&A 1944); <u>see also</u> <u>Langer v. Monarch Life Ins. Co.</u>, 966 F.2d 786, 806 (3d Cir. 1992).  Thus, even if the parties intended to include a commission for stock sales and change of control in the agreement, the fact that (1) the agreement is not ambiguous on its face and (2) such a term is absent from the agreement, this Court is barred from considering parol evidence of the parties' intent.[14]

    In addition, this Court is also skeptical that the parties intended a commission to be payable not only on a sale of assets

_____

    [14]  In addition, as discussed in Section III.B.2, <u>supra</u>, the parties were free to include language in the Second Brokerage Agreement obligating Defendant to pay a commission upon a number of different types of transactions.  However, the parties did not do so.

but also a merger based on the terms of the Second Brokerage
Agreement specifically relating to the payment of commissions.
From the terms of the Second Brokerage Agreement it is unclear
how a commission on a merger (as opposed to a sale of assets)
would be calculated and out of what proceeds.  It is clear from
Section 3.1, that Plaintiff would receive six percent of the
"total gross sale price of Assets purchased" (less certain
exclusions) in the event of an asset sale.  However, how the
parties would calculate a commission in the event of a merger
(where there may be no cash exchanged) is unclear.[15]  Further, it
is not clear what proceeds would be used to pay Plaintiff's
commission in the event of a merger. Section 3.5 of the Second
Brokerage Agreement states that Defendant is only obligated to
pay the commission from "monies actually received by Uni-Marts."
(Second Brokerage Agreement §3.5) In a merger (as demonstrated in
the present transaction), one party may not receive any cash as a
result of the merger.  This uncertainty makes Plaintiff's
argument that the parties intended for Defendant to pay a
commission in the event of a merger more dubious, especially
where no "monies" are "actually received by Uni-Marts."

　　　　Second, Plaintiff claims that Defendant is being

---

　　　　[15]  Moreover, it is unclear how such exclusions of the
"gross sales price" such as lease commitments, business
arrangements, underground petroleum and in-store merchandise
inventories would factor into the commission amount in a merger
transaction.

inconsistent by, on the one hand, arguing to the Court that the
form of the transaction (asset deal vs. a merger) is critical to
the Court's ultimately rejecting Plaintiff's claims for a
commission and, on the other hand, claiming that the transaction
was a sale of assets for tax purposes.  In support of the
argument, Plaintiff points out that, in Defendant's SEC filings,
Defendant (a) declared that "[f]or federal income tax purposes,
the merger...will be treated as a sale of assets, and (b) that
the merger resulted in "the assets...of Uni-Marts...be[ing] owned
by Green Valley."  (Proxy Statement, Def.'s Ex. B.)  Plaintiff
questions the credibility of Defendant's argument that the form
of the transaction is a critical to this Court's decision since
Defendant attempts to characterize the transaction as a sale of
assets for certain purposes (IRS elections) but a merger for
other purposes (arguments to the Court that no commission is owed
because a commission is only owed on a "sale of Assets.")

     This argument is unpersuasive. Defendant's election of tax
treatment for the Uni-Marts-Green Valley merger is not relevant
to the current case.  Section 338 of the Internal Revenue Code
permits a corporate taxpayer, even if it is selling stock, to
elect to have the transaction treated as a "sale of assets"
solely with respect to the tax treatment.  26 U.S.C. §338; <u>see
also</u> <u>General Bldg. Prods. Corp. v. State of New Jersey, Div. of
Taxation</u>, 14 N.J. Tax 232 (1994).  Such an election does not

transform a merger into a sale of assets.

### b.    Fundamental Difference between a Merger and a Sale of Assets

This Court's reliance on the strict construction of the Second Brokerage Agreement in order to find that the agreement does not require payment of a commission upon a merger is bolstered by the numerous legal differences between a sale of assets and a merger.  Plaintiff argues that a strict interpretation of the Second Brokerage Agreement "would be to declare that Uni-Marts could change the form, but not the substance of the deal, and effectively defraud the broker of rightful entitlements."  (Pl.'s Br. at 17.)  This is not the case in this transaction.  Rather, with this argument, Plaintiff is attempting to "blur the lines between an asset purchase and a merger agreement."  (Def.'s Reply Br. at 18.)  The two types of transactions are fundamentally different.  Defendant points the case of U.S. v. Philadelphia Nat. Bank, where the Supreme Court cites legislative history of the Clayton Act to show that Congress "was fully aware of the **important differences** between a merger and a pure purchase of assets." U.S. v. Philadelphia Nat. Bank, 374 U.S. 321, 345 (1963)(emphasis added)[16] Moreover, the

---

[16]  Specifically, the Supreme Court quoted Senator Kilgore's remarks before the Senate Committee on the Judiciary on Corporate Mergers and Acquisitions in which he highlighted the difference between a merger (a situation where one "issue[s] stock in the one corporation in lieu of the stock in the other corporation, whereupon the stock of the corporation which had been merged is

structure of New Jersey corporate law further highlights the fundamental differences between a merger and a sale of assets in that the procedural requirements for a corporation engaging in a merger are governed by a different statutory provision (N.J. Stat. Ann. § 14A:10-1 (West 1994)) than a corporation's sale of all of substantially all its assets (N.J. Stat. Ann. § 14A:10-10 and 11 (West 1994)).

   **D.   Whether Plaintiff is Entitled to a Commission Under the Doctrine of Quantum Meruit or Due to the Breach of the Covenant of Good Faith and Fair Dealing.**

Plaintiff contends that, if this Court holds that Plaintiff is not entitled to a commission under the Second Brokerage Agreement, the Court should find that Plaintiff is entitled to a commission either (i) through the doctrine of quantum meruit or (ii) because Defendant breached the covenant of good faith and fair dealing. (Pl.'s Opp. Br. at 23.)  Neither claim is asserted in the Complaint, and neither has been injected into the case prior to Plaintiff's filing of his brief in opposition to Defendant's summary judgment motion. (Pl.'s Opp. Br. at 23.) Neither claim is properly before the Court, as Plaintiff admits in filing his motion for leave to amend the Complaint to add

---

cancelled by the new corporation, and you have one corporation handling the operation of two") and a purchase of assets (a "purchase of physical assets, things upon which you can lay our hand, either in the records or on the ground....") Philadelphia Nat. Bank, 374 U.S. at 345 quoting Hearings before a Subcommittee of the Senate Committee on the Judiciary on Corporate Mergers and Acquisitions, 81st Cong., 1st and 2nd Sess. 176.

these two claims.  This Opinion will therefore not address Plaintiff's arguments at this time and a separate Opinion will adjudicate Plaintiff's motion to amend in the near future.[17]

**IV.  CONCLUSION**

For the reasons discussed above, this Court grants Defendant's motion for summary judgment and denies Plaintiff's motion for summary judgment. A non-final judgment will be entered in Defendant's favor upon the Complaint, without prejudice to Plaintiff's right to seek to add claims for recovery in quantum meruit, fraud, and for breach of covenant of good faith and fair dealing in Plaintiff's pending motion to amend, to be adjudicated shortly. The accompanying Order is entered.


**December 29, 2005**                    **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         United States District Judge

---

[17]   The Court notes that Plaintiff asserts claims for quantum meruit, fraud, and breach of covenant of good faith and fair dealing in its proposed Amended Complaint submitted on October 17, 2005. Such a proposed amendment will not be addressed here.  See discussion in Section I.D and n.8, supra.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

AVATAR BUSINESS CONNECTION,

INC.,

          Plaintiff,

    v.

UNI-MARTS, INC.,

          Defendant.

---

HON. JEROME B. SIMANDLE

Civil Action
No. 04-1866(JBS)

**ORDER**

This matter having come before the Court upon the motion of defendant Uni-Marts, Inc. for summary judgment and the cross-motion of plaintiff Avatar Business Connections, Inc. for summary judgement; and the Court having heard oral argument on October 14, 2005; and the Court having considered the parties' submissions; and the Court not yet having considered plaintiff's Motion to Amend/Correct Complaint [Docket Item No. 24] or defendant's opposition thereto [Docket Item No. 27] and for the reasons stated in the Opinion of today's date; and for good cause shown;

IT IS this **29th** day of December, 2005 hereby

**ORDERED** that defendant Uni-Marts, Inc.'s motion for summary judgment [Docket Item No. 12] be, and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that plaintiff, Avatar Business Connections, Inc.'s motion for summary judgment [Docket Item No.

1

20] shall be, and it hereby is, **DENIED**; and

    **IT IS FURTHER ORDERED** that judgment be entered on plaintiff's breach of contract claim in favor of defendant Uni-Marts, Inc., **without prejudice** to Plaintiff's right to seek to amend the Complaint to add causes of action for quantum meruit, fraud and for breach of covenant of good faith and fair dealing.

                                    **s/ Jerome B. Simandle**
                                    JEROME B. SIMANDLE
                                    United States District Judge